THE FEDERAL LAND BANK OF BALTIMORE, Petitioner and Appellant, *v.* THE MUNICIPAL COURT OF CIALES, ETC., Respondent and Appellee.

No. 6585. Argued December 21, 1934.—Decided January 18, 1935.

*Frank Martínez* and *E. Campos del Toro* for appellant. *V. Polanco de Jesús* for intervener and plaintiff in the main action.

Mr. Justice Córdova Dávila delivered the opinion of the Court.

Nicolás Padilla Rivera brought an action against The Federal Land Bank of Baltimore claiming a homestead right in a rural property measuring 21.75 acres (*cuerdas*), situated in the Ward Pesa of Ciales, which was sold at public auction to the said Bank by the marshal of the District Court of Arecibo, following mortgage foreclosure proceedings. It is further claimed in the complaint that the defendant bank, when it acquired the property, threatened the plaintiff to oust him from the house and adjacent lands, which constitute his homestead. The plaintiff prays that the Federal Land Bank of Baltimore be ordered to acknowledge his homestead right in the said property to the value of the same, that is, $500, and to convey to him a part of the property or the cash value of said right. The defendant appeared before the Municipal Court of Ciales and moved for a change of venue to the Municipal Court of San Juan on the ground that the action to establish a homestead claim is a personal action and that hence the defendant in such a suit is entitled to a trial in the court of his domicile.

After hearing the motion for a change of venue, the municipal court denied the motion on the ground that the action to establish a homestead right is in the nature of a real action that must be tried in the district where the homestead is established. The bank brought certiorari proceedings in the District Court of Arecibo to review the ruling of the Municipal Court of Ciales. The writ was issued and after a trial in the said court, the district court held that the homestead right is a real right and that an action to establish said right must be tried in the district where the subject of the action is situated, in accordance with Section 75 of the Code of Civil Procedure. Thereupon the writ issued was dis-

charged and the certiorari was dismissed. The defendant bank took an appeal from the ruling entered in this case. It is alleged that the lower court erred in holding that actions for the enforcement of homestead right are suits for the recovery of real property and that they must be tried in the district where the property subject to homestead is situated, and in refusing to reverse the ruling delivered by the Municipal Court of Ciales denying the motion of the Federal Land Bank of Baltimore for the transfer of the cause before said municipal court to the Municipal Court of San Juan, second section.

In its brief the appellant copies a paragraph from Corpus Juris which the Court cited in *Manescau* v. *Usera,* 46 P.R.R. 389 and in his citations he emphasizes the case of *Young* v. *Olivares,* 41 Fil. 391, and makes a reference to *Enciclopedia Jurídica Española,* volume 18, page 270, as a complement thereto. The paragraph from Corpus Juris whereupon the appellant relies reads as follows:

"The homestead provisions do not create a new title, or disturb the fee simple title or equitable title in the land itself. Nor do they strengthen or enlarge the title already existing. Only the use of the property is changed, and not the title itself. They do not create any interest in the property where the parties claiming homestead have no title or interest therein; nor do they constitute a defense to an action to quiet title, or to an action of ejectment."

Although it has been said that the interest created by the homestead institution depends entirely on the Organic Act or on statutory provisions, which are not the same in all the states, yet we think that there is no discrepancy as to the theory that the homestead does not convey any property whatsoever and that it does not disposses of the existing title. It may be said that nothing is transfered or received by virtue of this right. The head of the family owner of the property still has what he had before, with the limitation that he can not sell or encumber the homestead without the consent of his wife, or to dispose of the same by will.

Waples, in his work on "Homestead and Exemption," p. 102, expresses himself as follows:

"The state bestows not homestead property on anybody. It interferes with no man's title. It protects what he already owns, under conditions and with limitations. It does not create the homestead system as a charity. It does not confer shelter and hearth-stone upon the houseless poor. It does not distingu'sh between the poor and the rich in its policy for the conservation of existing homes. It does not confine itself to the shielding of the debtor from the creditor, as is popularly supposed, except in a few states."

The appellant argues that from a reading of our statute it appears that the homestead created thereby constitutes an exemption, a privilege conferred to the head of the family, thereby establishing an exception to the general rule that all the property of the debtor is liable for the payment of his debts. We have nothing to say regarding the right, almost the privilege, which is created for the benefit of the family. However, we are of opinion that this right may be a real right if predicated upon the subject of the homestead. As to the exemption conferred for the protection of the home, it must be conceded that it has certain characteristics which are absent in those exemptions which restrain the creditor from laying hands on certain property of the debtor.

In the case of *Young* v. *Oliveras, supra,* cited by the appellant, the Supreme Court of the Philippine Islands, said in reference to the homestead, that the right of exemption is not a real right in property; it constitutes rather a positive inhibition restraining the officer from laying hands thereon. "Such being the nature of the exemption," the court goes on saying, "it results that the extent of the interest which the debtor possesses in the property which he claims as a homestead is wholly immaterial." The *Enciclopedia Jurídica Española,* in a very interesting study on the homestead institution, says, that the homestead does not create a right *in rem,* but a purely personal right, and that in view thereof it can not be transferred or conveyed.

However this exemption can be distinguished from the other exemptions given by law for the benefit of the debtor. In the first place the fundamental reason of the homestead is the protection of the family, though there are some states that provide exemptions for pauper debtors, needy widows, and orphans only. Usually the debtor can alienate property exempted from execution, which he enjoys as long as he wants. This is not the case with the homestead. The head of the family can not waive the right thereto without the consent of his wife and neither can he dispose of said right by will. The exemption is in force while there is a family to protect and while the fundamental basis of the homestead exists. When the ends for which it was created disappear, the property is again responsible for the obligations contracted.

Waples, in the work cited, page 3, says:

"The conservation of family homes is the purpose of homestead legislation. The policy of the state is to foster families as the factors of society, and thus promote the general welfare. To save them from disintegration and secure their permanency, the legislator seeks to protect their homes from forced sales so far as it can be done without injustice to others.

"The reader will note the important difference between the policy to conserve homes for the good of society and the state, and the policy to save the property of poor debtors from execution for their own good. As elsewhere remarked herein, homestead statutes are not poor laws made for the benefit of the impecunious only. They protect the family homes of all classes. Any head of a family, however solvent and affluent, may dedicate his home under the statutory conditions, and feel sure that, whatever ordinary debts he may afterwards incur; whatever embarrassments he may encounter incident to such debts,— the home of his family is safe. It is evident, therefore, that under the prevalent homestead system (leaving now out of view the exceptional statutes which provide exemption for poor debtors and needy widows and orphans only), the policy is not to secure·to the householder a certain money-worth of realty; not to subserve the ·nterests of immediate beneficiaries only—but to protect *homes* as the pillars

of the state edifice. The charitable effects of homestead laws are merely incidental.

"The reasons which support this broad policy are cogent and readily apparent. Families are the units of society, indispensable factors of civilizaton, the bases of the commonwealth. Upon their permanency, in any community, depends the success of schools, churches, public libraries, and good institutions of every kind. The sentiments of patriotism and independence, the spirit of free citizenship, the feeling of interest in pupils affairs, are cultivated and fostered more readily when the citizen lives permanently in h's own castle with a sense of its protection and durability.

"The state is concerned in the conjugal and parental relations; in the promotion of marriages and the rearing of children; in the morality, refinement and religion of families and communities; and, on the other hand, it is injured, and its prosperity endangered, by the prevalence of divorces and by everything which tends towards the disintegration of families and the breaking up of homes. The proverb: 'When property comes in at the door, love flies out at the window,' is not invariably true; the beautiful picture, in Irving's Sketch Book, of the wife consoling and encouraging her husband upon the loss of his fortune is not an exceptional one; but is it not true that, when home itself has been taken away, the tendency is against the healthy growth of the sentiments above mentioned as conducive to the welfare of the state?"

The Supreme Court of Alabama in the case of *Watts* v. *Gordon*, 65 Ala. 546, expresses itself as follows:

"The great controlling purpose and policy of the constitution, is the protection, the preservation of the homestead,—the dwelling-place. A houseless, homeless population, is a burden upon the energy and industry, and corrupting to the morals of the community, of which they may be members. No greater calamity, not tainted with crime, can befall a family, than to be expelled from the roof under which it has been gathered and sheltered. Protection of an estate or interest in lands, whatever may be its dignity or inferiority, merely because it is an estate or interest in lands, is not the purpose of the constitution, or of the statutes. . . . It is the house, the dwelling-place,— not of necessity, an estate or interest in lands,—which must be protected and preserved. Usually, it is accompanied by such estate or interest; but, if it is not, it is the misfortune of the occupant, and

of those who are dependent upon him and can not subject it to a liability, to which it would not be exposed if such estate or interest attended it. . . . Whether these houses, attended by a legal right to the use and occupation of the land on which they stand, are a homestead within the purview of the constitution, and protected by it, depends, not on the quantity or quality of the estate of the lessee, but on the nature and character of the act with which they were put in place, and the intention of the lessee, as shown by the uses to which they are appropriated.''

From the *Enciclopedia Jurídica Española,* volume 18, page 270, we copy the following:

''The homestead institution has been opposed by some people on the grounds that its caracteristics of being non-seizable and non-alienable are very much like the revival of the ancient *fideicomisum.* The illustrious Ital·an professor Santangelo Spoto, who has justified with numerous arguments the reason for the existence of both principles in several articles and in his book *La legislazione civile e i Beni di famiglia* (1) calls it *fideicomesso democratico,* and makes an enthus·astic apology thereof, arguing that the name should not frighten the legislator nor the citizen, since, *tempora mutantur et nos mutamur cum illis,* and just as the significance of words change, the things and the institution known by said words also change with the lapse of time. The *fideicomesso democratico (democratic fideicomsum)*—he says—is not the juridical consecration of the big estate of the feud, to guarantee to the families of the nobles the possession of the force with which they ruled the others, and to the church the power to overthrow the powerful and the crowned heads; 'it is the judicial consecration of that minimum property with which a family may live working by itself, it is the fideicomisum of labor, which serves to secure for the farm laborer, for the small rural landowner the use and enjoyment of those necessary means of production and of living, without which he will always be defeated in the struggle against big landowners, aga·nst the rapacious capitalism.' (2) ''

And finally in a footnote to the case of *Andrews* v. *Security National Bank,* 83 A.L.R. 54, the commentator says as follows:

''The whole theory of the law with relation to homesteads is based upon the idea that as a matter of public policy, for the promo-

tion of the prosperity of the state, and to render independent and above want each citizen of the government, it is proper he should have a home where his family may be sheltered, and live beyond the reach of financial misfortune, and the demands of creditors who have given credit under such law. It is intended to secure to the householder a home for himself· and family, regardless of his financial ·condition, whether solvent or insolvent; without reference to the number of his creditors; and without any special regard to the extent of the estate or title by which the homestead may be owned. In no way does a homestead statute rest upon the principles of equity, nor in any way yield thereto. The policy of the state is to preserve the home to the family even at the sacrifice of just demands, for the reason that the preservation of the home is deemed of pramount importance. It is in pursuance of this purpose that no operative conveyance or effectual release of the homestead exemption can be made unless the mode pointed out by the statute is pursued with reasonable strictness.''

Waples entitles his book ''Homestead and Exemption,'' establishing a certain difference in the significance of those words. The legal meaning of the word *homestead,* according to the author, is the family residence owned, occupied, dedicated, limited, exempted and restrained in alienation as the statute prescribes. ''Since exemption is one of the characteristics of homestead, why is it made a separate subject in the title of this treatise? Why ''Homestead and Exemption?'' The author makes these questions and then explains that if the treatise were limited to the home, to the residence properly said, the use of this last word would not be necessary, but as the exemption extends to protect chattels and other immovables which are not homestead, he considers that the use of said word is not superfluous.

In the case of *In re Trammell,* 5 Fed. (2nd) 327 the difference in meaning of the two words is given more clearly. In this case the court says:

''Let it be remembered that a 'homestead' and an 'exemption' are quite different things. A 'homestead' is properly 'the home place— the home and the adjoining land.' Bouvier, Law Dict. (3d Ed.). It

is therefore realty. When established according to statutory require-
ments, it is commonly made exempt from forced sale, and the family
is often g'ven special right in it. An 'exemption' is 'the right given
by law to a debtor to retain a-portion of his property without its
being liable to execution at the suit of a creditor or to distress for
rent.' Bouv'er, Law Dict. (3d Ed.). This right of the debtor may
refer to realty, personalty, or both.

The purpose of homestead legislation is achieved by ren-
dering effective the exemption and by limiting the *jus dis-
ponendi* by sale or will. To that respect Waples says:

"It is property—not merely a privilege respecting it, or an indis-
pensable right in it, or *quasi-estate* not proprietary or transferable—
wh'ch the law exempts. It is property which, in the absence of
exemption, would be liable to execution. Personal rights and privi-
leges not disposable would not be liable to execution under any cir-
cumstances. They would be lost by the execution of that on which
they rest, if not reserved; and, under some circumstances, they have
been reserved in sales of homesteads. They are benefits inseparably
connected with the homestead, but they do not constitute it."

Now, what is the nature of this right created by law?
What is the name given to it in the American legal termi-
nology? Of course, the decisions of the respective states vary
according to the wording of the local statutes, and though
the authorities disagree somewhat, it can be said that the
nature of the homestead is practically the same in all the
states where real property has been exempted from execu-
tion and where the property rights of the owners have been
limited. Chapter nine of Waples' work is entitled "Quasi-
Estate of Homestead". The author points out that the
phrase "estate of homestead" has been used to some extent,
though it is eschewed by the courts in most of the states.
"If employed only in the sense in which we may speak of
dower as an estate for life, meaning for instance, that it is
an estate for life, or for years, it may not mislead. If, on
the other hand, we use the term as though it designated a
new kind of estate distinguishable from those of freehold

long established, we may create confusion if we do not lead to error." "What kind of an estate in land?" the same author asks. "It is one in fee, or for life, or for a term, or at will: not a new kind of estate in land. The estate of homestead as no independent existence, apart from the title. However it resembles an estate in some respects: hence the title of this chapter."

In *Whitworth* v. *McKee*, 72 Pac. 1046, the Supreme Court of Washington, says:

"Homestead interest was something more than a mere privilege conferred by the Legislature as an act of grace which might be taken away or destroyed by that body at its pleasure—that it was, in fact, a vested interest."

And the Supreme Court of Nebraska in *Galligher* v. *Smiley* 28 Neb. 2189 declares that the homestead right, while *Smiley,* 28 Neb. 2189, declares that the homestead right, while in the home, so far vested in the owner as to be beyond the reach of the legislature by a repeal of the law creating it.

The homestead transfers no property or title whatsoever, and its constitution has not the effecet of changing the status of the owner as to the property. The law limits its effects to grant the householder the right to continue in the use and enjoyment of his home and to tell the creditors to lay off their hands from it. In our judgment that is enough. The right of the householder to continue in the possession of that which belongs to him but which would no longer be his were it not for the protection of the law, is cast directly on the property and is so united to it that the homestead would not exist if separated from the property title. We are aware of the fact that the property rights, as pointed out by Waples, which are the basis of the homestead, are conditioned by negatives. The owner can not dispose of it by will nor sell it by himself and his creditors can not make it responsible for his debts; but extending what was said in *Manescau* v. *Usera, supra,* it is all cast on the property rather than being

related thereto, and in accordance with the provisions of Section 75 of the Code of Civil Procedure, in relation with our homestead law, the action for the recovery of this right must be tried in the district where the property is situated.

If we examine carefully the law of Puerto Rico we notice that it resembles very much the law in force in the state of Illinois. Section 1 of this law transcribed in the case of *Browning* v. *Harris,* 99 Ill. 455, reads as follows:

"That every householder having a family 'shall be entitled *to an estate of homestead,* to the extent and value of one thousand dollars, in the farm or lot of land and buildings thereon, owned or rightly possessed, by lease or otherwise, and occupied by him or her as a residence; and such homestead, and *all right and title therein,* shall be exempt from attachment, judgment, levy or execution, sale for the payment of his debts, or other purposes, and from the laws of conveyance, descent and devise, except as hereinafter provided.' "

Section one of the law of Puerto Rico in its pertinent part reads as follows:

"That every householder, having a family, shall be entitled *to an estate of homestead* to the extent and value of five hundred dollars in a farm, plantation, or lot of land, and buildings thereon, owned, or lawfully possessed, by lease or otherwise and occupied by him or her, as a residence, and such homestead and *all right and title therein,* shall be exempt from attachment, judgment, levy or execution, except for the taxes due thereon, or purchase price of said property, or liability incurred for the improvements placed thereon, and except as hereinafter prescribed. . ."

The provisions of both sections are very similar. Really it may be said that our homestead law is an adaptation from that of Illinois with some modifications, as pointed out by Professor Muñoz Morales in the *Revista Jurídica de la Universidad de Puerto Rico,* volume 4, page 88. We have arrived at that conclusion after examining the laws of the various states, which Waples substantially transcribes in the appendix to his work. The law of Illinois, like ours, talks about *an estate of homestead* to which every householder

having a family is entitled and declares exempted from execution all right and title therein.

The decisions of the Supreme Court of California must be studied in the light of the applicable laws in force when they were delivered. In the decision construing the law in force in 1851 it is held that according to the same no estate in land exists. But in the last decisions, where the law of 1873 is studied, analyzed and construed, the same Court declares that the law in force creates an estate of homestead.

The Supreme Court of the United States, in the case of *Black* v. *Curran,* 81 U. S. 463, following its traditional custom, adopted the theory of the local court and held, construing the former law, that the same did not create an estate in the land. In the case of *Browning* v. *Harris, supra,* the Supreme Court of Illinois in construing the law of 1873 which by the way, has suffered some amendments, expresses itself as follows:

"The right of homestead having been, by the amendatory act of 1873, enlarged into an *estate,* it follows that, like all other estates, it can have no separate existence independent of the title which constitutes one of its essential elements. Every owner of a homestead, under the present law, has an estate in the premises, either in fee for life or years, to the extent of $1,000. Where the head of the family, having an estate in fee in the homestead premises, dies, and the right of homestead devolves upon the surviving husband or wife by operation of law, a life estate is carved out of the fee for the purposes of such estate of homestead, and the heirs take a reversion in fee, only, expectant upon the termination of such life estate. In like manner, where the homestead is cast upon the children of the family, an estate for years is, by operation of law, carved out of the fee for the purposes of such estate of homestead in the children."

The provisions of the law of Illinois and those of the law of Puerto Rico are similar in this respect, with the difference that there the right·acquired by the widower or widow when the homestead is cast upon them is called *estate for life* and here we call it usufruct of the surviving spouse. The same

thing happens with the minors. There it is called *estate for years* and here it might be called temporary usufruct, inasmuch as it lasts until the children become of age.

In the case of *Fritts* v. *Fritts*, 131 N. E. 584, decided by the Supreme Court of Illinois, it is said by said court construing the same law that:

"It is the rule in this state that a homestead is more than a mere right of occupancy exempt from levy and sale for debts. Where land occupied as a homestead does not exceed $1,000 in value no valid lien can be secured on such land or sale had thereof during the existence of such homestead estate, even though it is sought to sell such property subject to the homestead right. The land embraced in the homestead cannot be sold to pay the debts of the owner of the fee during the life of his widow and the minority of his children."

The provisions mentioned and commented upon by the court of Illinois appear in Section four of our homestead law, which today is Section 554 of our Civil Code, edition of 1930. According to this section no sale shall be made, under a judgment or execution of any farm, plantation or lot of land and dwellings thereon, when the same is claimed or occupied as a homestead, unless a greater sum than five hundred dollars is obtained therefor. Our law, as that of Illinois, absolutely forbids the sale of any property when its value does not exceed $500 or when a sum greater than that can not be obtained.

As to the motion for a change of venue denied by the Municipal Court of Ciales, we think that said court acted in accordance with the law. According to Section 75 of the Code of Civil Procedure actions *for the recovery of real property, or of any estate or interest therein, etc.** must be tried in the district in which the subject of the action, or some part thereof, is situated, subject to the power of the court to change the place of trial. We use the English text because these laws were originally written in that language and we want to emphasize the similarity existing between the *estate*

---

* In English in the original text.

*or interest therein* of which the said section speaks, and the *estate of homestead, right and title therein* of which our homestead law speaks. Section 75 clearly provides that an action for the recovery of an estate or interest therein must be tried in the district in which the subject of the action is situated. In the present case, as alleged in the complaint, the Federal Land Bank of Baltimore threatened Nicolás Padilla Rivera, a householder with a wife and children, to oust him from the property where he has his homestead established. The plaintiff in the homestead claim prays to be left in the property, thus acknowledging his homestead right in the same, or that he be given the sum of $500. The value of the property does not appear from the pleadings, but it is clear that the fundamental basis of this suit is the acknowledgment of the *estate of homestead* in the property in the possession of Nicolás Padilla, and that therefore, the trial must be held where the property is situated, that is, in the municipality of Ciales.

The judgment appealed from must be affirmed.